1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

11
12
13
14
15
16
17

GEECHIE DEVAIN TEMPLETON,

    Plaintiff,

        v.

JOSE ESQUETINI, et al.,

    Defendants.

NO. EDCV 19-00813-FWS (AGR)

REPORT AND
RECOMMENDATION OF UNITED
STATES MAGISTRATE JUDGE

18
19
20
21
22

      The court submits this Report and Recommendation to the Honorable Fred W. Slaughter, United States District Judge, pursuant to 28 U.S.C. § 636 and General Order No. 05-07 of the United States District Court for the Central District of California.  For the reasons set forth below, the court recommends that Defendants' motion for summary judgment be granted.

23
24
25
26
27
28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**I.**

**SUMMARY OF PROCEEDINGS**

On April 30, 2019, Plaintiff, a federal prisoner proceeding *pro se* and *in forma pauperis*, filed a complaint under *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 402 U.S. 388 (1971).  (Dkt. No. 1.)  Plaintiff asserted claims against eleven employees of the Federal Bureau of Prisons ("BOP") at the Federal Correctional Complex at Victorville ("FCC Victorville").

Defendants Alamilla, Esquetini, Blier (sued as "Blair"), Rivera, Mariscal (sued as "Meriscal"), Park, Johnston, Leen, Delay, Reams and Fast filed a motion for summary judgment based on failure to exhaust administrative remedies or, in the alternative, to dismiss the complaint for failure to state a claim.  (Dkt. No. 47.)  On November 10, 2020, the District Court accepted the recommendations in the Report and Recommendation dated October 7, 2020, denied the motion for summary judgment, denied the motion to dismiss with respect to Defendants Alamilla, Blier, Esquetini, Leen, Reams and Rivera, and dismissed the claims against Defendants Delay, Fast, Johnston, Mariscal and Park with leave to amend.  (Dkt. Nos. 73, 69.)

Plaintiff did not file an amended complaint and the action proceeded against Defendants Alamilla, Blier, Esquetini, Leen, Reams and Rivera ("Defendants").  On December 30, 2020, Defendants filed an answer.  (Dkt. No. 75.)

On December 6, 2021, Defendants filed a motion for summary judgment under Fed. R. Civ. P. 56.  (Dkt. No. 95.)  The court set a briefing schedule and notified Plaintiff of the requirements for opposing a summary judgment motion.  (Dkt. No. 96.)  Plaintiff has not filed an opposition, although the court twice granted his requests for an extension of time to do so.  (Dkt. Nos. 99, 101.)  The motion was taken under submission.

## II.

## **PLAINTIFF'S CLAIMS**

Plaintiff alleges Eighth Amendment claims for deliberate indifference to his medical needs while was housed in the Special Housing Unit ("SHU") of the United States Penitentiary at Victorville ("USP Victorville").   (Compl. at 2, 7, 10.)[1] He seeks damages.  (*Id.* at 37-38.)

Plaintiff alleges that on July 18, 2018, he slipped and broke the pinky finger on one hand.  (*Id.* at 10.)  During the following week, Plaintiff verbally requested medical care and pain medication from Defendants and submitted four sick call requests.  (*Id.* at 14-33.)  He did not receive medical treatment until July 25, 2018. (*Id.* at 18-21.)  He spent one week with no pain medication and one week with only ibuprofen and Tylenol.  (*Id.* at 37.)  On August 1, 2018, he had surgery, which required a T-plate and screws in his hand.  (*Id.* at 37, 56.)

## III.

## **APPLICABLE STANDARDS**

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party has the initial burden of production to demonstrate the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "If the moving party shows the absence of a genuine issue of material fact, the non-moving party must go beyond the pleadings and 'set forth specific facts' that show a genuine issue for trial."  *Leisek v. Brightwood Corp.*, 278 F.3d 895, 898 (9th Cir. 2002) (citing *Celotex Corp.,* 477 U.S. at 323-24).  The non-moving party may not rely upon mere allegations or denials in the pleadings but must set forth specific facts showing that there exists a genuine issue for trial.  *Anderson v. Liberty Lobby*

---

[1]     The court will use the page numbers assigned by the CM/ECF system for the complaint and its attachments.

1  *Inc.*, 477 U.S. 242, 249 (1986).

2        When the nonmoving party is *pro se*, a court must consider as evidence in

3  opposition to summary judgment all contentions "offered in motions and

4  pleadings, where such contentions are based on personal knowledge and set

5  forth facts that would be admissible in evidence, and where [the party appearing

6  *pro se*] attested under penalty of perjury that the contents of the motions or

7  pleadings are true and correct."  *Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir.

8  2004).

9        The court must view all evidence in the light most favorable to the

10  nonmoving party and must draw all reasonable inferences in its favor.  *Anderson*,

11  477 U.S. at 255.  A plaintiff must "produce at least some significant probative

12  evidence tending to support" the allegations in the complaint.  *Smolen v. Deloitte,*

13  *Haskins & Sells*, 921 F.2d 959, 963 (9th Cir. 1990) (internal quotation marks and

14  citations omitted).  The court "need not examine the entire file for evidence

15  establishing a genuine issue of fact, where the evidence is not set forth in the

16  opposing papers with adequate references so that it could conveniently be

17  found."  *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th

18  Cir. 2001).  This is true even when a party appears *pro se*.  *Bias v. Moynihan*,

19  508 F.3d 1212, 1219 (9th Cir. 2007).

20        Not every factual dispute will defeat summary judgment.  "[T]he mere

21  existence of *some* alleged factual dispute between the parties will not defeat an

22  otherwise properly supported motion for summary judgment; the requirement is

23  that there be no *genuine* issue of *material* fact."  *Scott v. Harris*, 550 U.S. 372,

24  380 (2007) (emphases in original, citation and quotation marks omitted).  "Where

25  the record taken as a whole could not lead a rational trier of fact to find for the

26  nonmoving party, there is no genuine issue for trial."  *Matsushita Elec. Indus. Co,*

27  *Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (internal quotation marks

28  and citation omitted).

4

# IV.

# FACTUAL BACKGROUND

The following facts are uncontroverted unless otherwise specified. Additional facts are included in the Discussion portion of the Report.  Plaintiff has not filed an opposition or submitted evidence to oppose the motion.  However, he attached inmate declarations to his complaint and Defendants have submitted portions of the transcript of his deposition.[2]  In consideration of Plaintiff's *pro se* status, the court will consider this evidence although it has no obligation to do so. *See Bias*, 508 F.3d at 1219; *Carmen*, 237 F.3d at 1031.

Plaintiff was incarcerated at USP Victorville from approximately December 2017 until October 2018.  (Defendants' Statement of Undisputed Facts ("SUF") No. 1.)  Around July 11, 2018, he was placed in the SHU.  (SUF No. 2.)

Inmates housed in the USP Victorville SHU are assigned to one of two PA's as their primary care providers.  The PA's generally visit the SHU on Wednesdays for non-emergency appointments with inmates who have submitted a sick call request.  (SUF No. 6.)  An inmate requesting a non-emergency medical appointment fills out a sick call form, which is delivered to his assigned PA, who in his or her discretion sets an appointment to see the inmate the following Wednesday.  (SUF No. 7.)  Defendant Esquetini was one of the PA's assigned to the SHU.  (Declaration of J. Esquetini, dated December 3, 2021 ("Esquetini Decl.") ¶¶ 1- 2.)  Plaintiff's assigned PA was not Esquetini but non-defendant B.

---

[2]     Plaintiff attached a declaration of Justin Lemar Martin dated July 24, 2018 ("Martin Decl."), a declaration of Sammy Bohanon dated July 28, 2018 ("Bohanon Decl."), and an undated statement of Esequiel Pena.  (Compl. at 64-68.)
        The Pena statement is not under penalty of perjury and the court will not consider it.  (*Id.* at 68.)  The Martin and Bohanon declarations substantially comply with 28 U.S.C. § 1746 and the court will consider them.  *See CFTC v. Topworth International, Ltd.*, 205 F.3d 1107, 1112 (9th Cir.1999) (finding declaration adequate where it was "in substantial compliance with 28 U.S.C. § 1746").  The court notes, however, that inmate Martin purports to have signed his declaration on July 24, 2018, but makes assertions about events after that date.  (Martin Decl. at 2.)

1    Wolverton.  (SUF No. 9.)

2          On July 18, 2018, around 3:20 p.m., Plaintiff slipped while stepping out of

3    the shower and injured his hand.  (Deposition of Geechie Devain Templeton

4    ("Templeton Depo.") at 57, 115; Martin Decl. at 1.)  Plaintiff testified, and his

5    cellmate Martin declares, that they could see the tip of a bone protruding through

6    the skin and Plaintiff's hand was bleeding and began to swell.  (Templeton Depo.

7    at 64-65; Martin Decl. at 1.)  By "about the 20th" the swelling was so big that the

8    bone was back under the skin.  (Templeton Depo. at 64.)  Around July 21, 2018,

9    Plaintiff started seeing discoloration.  (*Id.* at 67.)  He testified that by July 19,

10   2018, his pain level was 10 and between July 19 and 25, 2018, his pain level

11   ranged from 7 to 10.  (*Id.* at 61.)

12         Plaintiff's assigned PA was on out on leave.  (Templeton Depo. at 72, 158,

13   160; Esquetini Decl. ¶ 6.)  Plaintiff first received medical attention for his hand on

14   Wednesday, July 25, 2018.  (Esquetini Decl. ¶ 7; Templeton Depo. at 193-97.)

15   The evidence regarding Plaintiff's alleged interactions with Defendants prior to

16   July 25, 2018, is set forth in the Discussion portion of the Report.  Plaintiff testified

17   that he started documenting his interactions with staff "right after the 18th" and, on

18   July 23, 2018, he started writing out the timeline that he attached to his complaint.

19   (*Id.* at 98, 101.)

20         On July 25, 2018, Esquetini examined Plaintiff's hand, ordered an X-ray,

21   and after reviewing the results referred Plaintiff to an outside emergency room

22   ("ER").  (SUF No. 19.)  At the ER, Plaintiff was diagnosed with a boxer's fracture

23   and his hand was placed in a splint.  (Esquetini Decl. ¶ 10; Declaration of R.

24   Gilliam dated December 2, 2021 ("Gilliam Decl."), Exh. A at 2.)  The ER report

25   stated that Plaintiff was "adamant that the bone had broken through the skin and

26   that he pushed it back in," but the "overlying skin revealed no evidence of an open

27   wound to indicate an open fracture."  (*Id.*, Exh. A at 1-2.)

28         The same day, Esquetini contacted orthopedic surgeon Dr. Daniel Lee and

1   scheduled an appointment for Plaintiff for the earliest available date, July 30,

2   2018.  (Esquetini Decl. ¶ 7.)  On July 26, 2018, Esquetini prescribed pain

3   medication for Plaintiff: 800 mg ibuprofen to take three times a day for seven

4   days.  (*Id.* ¶ 10, Exh. E.)  Plaintiff testified that the ibuprofen did not help the pain.

5   (Templeton Depo. at 69.)  On July 27, 2018, Wolverton brought him Tylenol, but

6   that did not help either.  (*Id.* at 70, 74.)

7       Dr. Lee saw Plaintiff on July 30, 2018, and recommended surgery.

8   (Esquetini Decl. ¶ 11.)   Dr. Lee performed the surgery on August 1, 2018.  (*Id.* at

9   11; Gilliam Decl., Exh. C; Templeton Depo. at 67.)  The Operative Report gives

10  the diagnosis as "right 5th metacarpal shaft fracture" and describes the operation

11  as "open reduction and internal fixation of right 5th metacarpal shaft fracture"

12  involving a T-plate and screws.  (Gilliam Decl., Exh. C at 1-2.)

13                                    **V.**

14                              **DISCUSSION**

15      **A.    Applicable Federal Law**

16      A prison official's "deliberate indifference" to a substantial risk of serious

17  harm to an inmate violates the Eighth Amendment.  *Farmer v. Brennan*, 511 U.S.

18  825, 828 (1994).  Liability requires a showing that "the official knows of and

19  disregards an excessive risk to inmate health or safety; the official must both be

20  aware of facts from which the inference could be drawn that a substantial risk of

21  serious harm exists, and he must also draw the inference."  *Id.* at 837.  "In

22  addition, prison officials who actually knew of a substantial risk to inmate health or

23  safety may be found free from liability if they responded reasonably to the risk,

24  even if the harm ultimately was not averted."  *Id.* at 844.

25      In the medical context, a prison official violates the Eighth Amendment

26  through deliberate indifference to an inmate's serious medical needs.  *Estelle v.*

27  *Gamble*, 429 U.S. 97, 106 (1976).  To state an Eighth Amendment claim, a

28  plaintiff must first show a "serious medical need" by alleging that failure to treat

1    his condition could result in further significant injury or the unnecessary and

2    wanton infliction of pain.  *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006).

3    Second, a plaintiff must show that the defendant's response to the need was

4    deliberately indifferent.  *Id.*  This second prong of the test is satisfied when a

5    plaintiff shows, as to each defendant, "(a) a purposeful act or failure to respond to

6    a prisoner's pain or possible medical need and (b) harm caused by the

7    indifference."  *Id.*  Deliberate indifference to serious medical needs "may appear

8    when prison officials deny, delay or intentionally interfere with medical treatment,

9    or it may be shown by the way in which prison officials provide medical care."

10   *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988); *see also Estelle,*

11   429 U.S. at 104-05 (deliberate indifference may be manifested "by prison doctors

12   in their response to the prisoner's needs or by prison guards in intentionally

13   denying or delaying access to medical care or intentionally interfering with the

14   treatment once prescribed" (footnotes omitted)).  Negligence is not enough.

15   *Estelle,* 429 U.S. at 105-06.

16        A difference of opinion between a medical professional and the prisoner, or

17   between medical professionals, concerning what medical care is appropriate does

18   not amount to deliberate indifference.  *Hamby v. Hammond*, 821 F.3d 1085, 1092

19   (9th Cir. 2016).  Rather, the plaintiff must show that the chosen course of

20   treatment was medically unacceptable under the circumstances and that the

21   defendant chose it in conscious disregard of an excessive risk to the plaintiff's

22   health.  *Id.*

23        A delay in medical treatment generally amounts to deliberate indifference

24   only if it caused further harm.  *Wood v. Housewright*, 900 F.2d 1332, 1335 (9th

25   Cir. 1990); *Hunt v. Dental Dept*., 865 F.2d 198, 200 (9th Cir. 1989); *Shapley v.*

26   *Nevada Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985); *see also*

27   *Hallett v. Morgan*, 296 F.3d 732, 746 (9th Cir. 2002) (delayed dental care did not

28   violate Eighth Amendment because plaintiffs did not show "delays occurred to

8

patients with problems so severe that delays would cause significant harm and that [d]efendants should have known this to be the case").

## B. Analysis

Although Defendants dispute Plaintiff's characterization of his injury, they do not dispute that his finger injury constituted a serious medical need. Rather, they contend that Plaintiff has not raised a triable dispute as to whether they were deliberately indifferent.

### 1.    Nature of Injury and Delay in Treatment

In the complaint, Plaintiff alleged that he had a compound fracture of his pinky finger. (Compl. at 21.) Plaintiff testified at his deposition that after his hand was x-rayed on July 25, 2022, Esquetini told him that he had a compound fracture and needed to go to the ER quickly in case of infection. (Templeton Depo. at 197-98.) Plaintiff also testified that shortly after his fall he could see the tip of a bone through the skin, but later it was covered by the swelling. (*Id.* at 64-65.) His cellmate Martin corroborated that after Plaintiff's fall he could see the tip of a bone through the skin. (Martin Decl. at 1.) According to the ER report, Plaintiff told the ER medical staff that the bone had broken through the skin but he had pushed it back in.[3] (Gilliam Report, Ex. A at 1.) An open fracture presents a potentially life-threatening emergency due to risk of infection. (Esquetini Decl. ¶¶ 5, 8.)

The uncontroverted medical evidence shows that Plaintiff did not have an open fracture. Although Esquetini's clinical encounter note on July 25, 2018, gives the provisional diagnosis as "compound fracture 5th metacarpal," (Esquetini Decl., Exh. C at 2), Esquetini declares that he found "some dry blood on the surface, but no evidence that there had ever been any open fracture." (Esquetini Decl. ¶ 8.) He nevertheless treated Plaintiff's need for medical attention as emergent because Plaintiff's finger was cold on palpation. (*Id.*) The radiologist's

---

[3]    At his deposition, Plaintiff denied that he pushed the bone in and said the swelling did it. (Templeton Depo. at 64.)

1   July 25, 2018 report found an "[a]cute oblique fracture of the distal shaft of the

2   fifth intercarpal," with "volar angulation and "overlying soft tissue swelling." (*Id.*,

3   Exh. D.)  The ER Report states that Plaintiff had a "known diagnosis of a boxer's

4   fracture" and the "overlying skin revealed no evidence of an open wound to

5   indicate an open fracture." (Gilliam Decl., Exh. A at 2.)  The hand surgeon

6   described the injury as a "right 5th metacarpal shaft fracture." (Gilliam Decl., Exh.

7   C at 1.)  The record contains no evidence of infection. (Esquetini Decl. ¶ 8;

8   Gilliam Decl., Exh. A at 2.)

9        Plaintiff first received medical treatment for his finger injury on July 25,

10   2018, seven days after he sustained the injury, and surgery was performed on

11   August 1, 2018, 14 days after the injury.[4]  (Esquetini Decl. ¶¶ 7, 9, 10, 11; Gilliam

12   Decl., Exh. C; Templeton Depo. at 203.)  Plaintiff testified that Dr. Lee told him the

13   surgery went well. (Templeton Depo. at 207-08.)

14        Plaintiff also testified that he developed tendonitis as a result of the plate

15   and pins placed in his hand during the August 1, 2018 surgery, and had constant

16   level 5 or 6 pain until he had follow-up surgery on October 7, 2021, to remove the

17   pin and plate. (*Id.* at 78-80.)  Plaintiff does not contend, and there is no medical

18   evidence suggesting, that this outcome would have been any different if the

19   August 1, 2018 surgery had been performed a few days earlier.  There is no

20   evidence that Plaintiff suffered any adverse medical effects to his hand as a result

21   of the one-week delay in medical treatment.

22        In general, courts in the Ninth Circuit have found that comparable delays of

23   medical treatment for comparable injuries did not constitute deliberate

24   indifference, at least when the delay caused no substantial harm.  *See Wood v.*

25   _____

26        [4]     Plaintiff does not contend (and could not) that the one-week delay
    between his July 25, 2018 medical visit and his August 1, 2018 surgery was
27   unreasonable.  (Templeton Depo. at 68-69.)  At his deposition, he explained that
    his claim is based on the one-week delay before his July 25, 2018 medical visit
28   and the two-week period (between July 18 and August 1, 2018) with no pain
    medication or pain medication that was insufficient for his pain.  (*Id.* at 69-70, 73.)

1   *Housewright*, 900 F.2d 1332, 1333, 1335 (9th Cir. 1990) ("several days" of delay

2   after inmate "broke one of the pins in his shoulder" was not deliberate indifference

3   when "condition did not require emergency assistance" and "the only remedy

4   immediately available was a prescription for painkillers"); *Carr v. Cal. Dep't of*

5   *Corr.*, No. 14-cv-02074-LJO-BAM (PC), 2016 WL 6648639, at *3 (E.D. Cal. Nov.

6   9, 2016) (23-day delay in "receiving pain medication and treatment for a broken

7   rib," apparently arising from delay in reviewing x-rays, was not deliberate

8   indifference); *Martin v. Hedgpeth*, No. C 12-3771-YGR (PR), 2014 WL 4756597,

9   at *8 (N.D. Cal. Sept. 24, 2014) (delays of five and 11 days in receiving treatment

10  for broken finger did not constitute deliberate indifference when no substantial

11  harm resulted from delay); *Lambert v. Soto*, No. 10cv1976-AJB (BLM), 2012 WL

12  5878503, at *5-6 (S.D. Cal. Sept. 21, 2012) (16-day delay in treating plaintiff's

13  "swelling and bleeding," "serious injuries to [plaintiff's] back," "difficulty breathing,"

14  "a dislocated shoulder," and inability "to bear any weight on his leg due to a

15  severe knee sprain" did not constitute deliberate indifference when plaintiff did not

16  allege harm from delayed treatment), *accepted by* 2012 WL 5878427 (S.D. Cal.

17  Nov. 21, 2012); *compare Jett*, 439 F.3d at 1094-95, 1097 (nearly two-month wait

18  for doctor, 19-month delay before seeing hand specialist, and failure to set and

19  cast inmate's badly fractured thumb, which then "healed improperly," created

20  triable issue regarding deliberate indifference).

21              **2.      Pain Medication**

22          Although there is no evidence that the one-week delay in receiving medical

23  treatment caused any damage to Plaintiff's finger, Plaintiff testified that he was in

24  extreme pain during that time.  (Templeton Depo. at 61.)  Plaintiff's cellmate

25  Martin also declares that Plaintiff was in great pain all week.  (Martin Decl. at 1-2.)

26  Defendants attempt to cast doubt on Plaintiff's level of pain, pointing to evidence

27  that he never pressed the emergency button in his cell and spent eight hours

28  outside his cell on July 21, 2018 and an hour and a half on July 23, 2018.

1    (Templeton at 61-62, 269-273.)  On this motion, the court accepts Plaintiff's

2    evidence about his level of pain as true.

3         It is undisputed that Plaintiff did not receive pain medication until July 26

4    2018.  (Esquetini Decl. ¶ 10; Templeton Depo. at 69.)  On July 26, 2018,

5    Esquetini prescribed ibuprofen, 800 mg three times a day for seven days.  (*Id.*

6    ¶ 10, Exh. E.)  Plaintiff testified that the ibuprofen did not help his pain.

7    (Templeton Depo. at 69.)  On July 27, 2018, PA Wolverton brought Plaintiff

8    Tylenol, but that did not help either.  (*Id.* at 70, 74.)

9         Plaintiff cannot assert claims against Defendants based on the alleged

10    inadequacy of ibuprofen and Tylenol to alleviate his pain between July 26 and

11    August 1, 2018.  Although Plaintiff testified he submitted sick call requests and

12    mentioned the matter to nurses passing out medication, he did not testify to

13    contacts with any Defendant.  (Templeton Depo. at 70.)  Moreover, according to

14    Plaintiff, by July 27, 2018, Wolverton had returned from vacation.  (Templeton

15    Depo. at 69-71.)  Wolverton was Plaintiff's assigned PA and was responsible for

16    his medical care.  (*Id.* at 42.)  She is not a defendant.  Most importantly, this is

17    "the sort of difference[] of opinion about the best way to address pain that courts

18    have repeatedly held either not to state a claim or not to create a triable issue on

19    the deliberate indifference prong of an Eighth Amendment claim."  *Miller v.*

20    *California Dep't of Corr. & Rehab.*, No. 16-CV-02431-EMC, 2018 WL 534306, at

21    *16 (N.D. Cal. Jan. 24, 2018) (collecting cases).

22         As for the failure to provide Plaintiff with any pain medication before July

23    26, 2018, the court will discuss Plaintiff's interactions with each Defendant to

24    determine whether Plaintiff has raised a triable dispute as to whether that

25    Defendant consciously disregarded Plaintiff's need for pain medication.

26            **3.**     **Defendant Esquetini**

27               **a.**     <u>**Allegations of Complaint**</u>

28    Plaintiff alleges that he showed Esquetini his injured hand on July 19, 2018,

1  at about 8:40 a.m., when Esquetini was distributing medication.  (Compl. at 18.)

2  Esquetini looked at Plaintiff's hand through the window and said, "That's a

3  problem."  (*Id.*)  Plaintiff handed Esquetini a sick call request and asked for

4  medical attention and pain medication.  Esquetini said he was not Plaintiff's

5  assigned PA and he would give the form to Plaintiff's PA.  Plaintiff told Esquetini

6  that she was out for a week, but Esquetini left.  (*Id.*)

7       When Plaintiff was taken to the Health Services on July 25, 2018, Esquetini

8  initially told Plaintiff he was not on the list to be seen, but treated Plaintiff after

9  Defendant Leen confirmed that Plaintiff had notified her of his injury.  (*Id.* at 21.)

10                  **b.**   **Evidence: Plaintiff's Version**

11       Plaintiff testified that on July 19, 2018, he showed Esquetini his hand for 10

12  to 15 seconds, and Esquetini looked at it but did not examine it or say anything

13  about it.  (Templeton Depo. at 157.)  Plaintiff told Esquetini that his hand was

14  broken and he was in extreme pain.  (*Id.*)  He gave Esquetini a sick call request

15  that Esquetini said he would give to Plaintiff's PA.  (*Id.* at 158.)

16       When Plaintiff was taken to Health Services on July 25, 2018, Esquetini

17  initially did not want to see him, saying Plaintiff was not on the list of patients, but

18  treated Plaintiff after Defendant Leen intervened.  (*Id*. at 55-56.)  Esquetini sent

19  Plaintiff to be x-rayed and, after receiving the results, immediately started doing

20  paperwork to send Plaintiff to the ER.  (*Id.* at 196-97.)  Esquetini told Plaintiff that

21  he had a compound fracture and, if bone came through the skin, Plaintiff could

22  suffer a serious infection.  (*Id.* at 198, 201.)  The same day, Plaintiff was taken to

23  the ER, where he was splinted and told he needed surgery.  (*Id.* at 202.)

24       Plaintiff's cellmate Martin declares that Esquetini was among the persons

25  from whom Plaintiff verbally requested medical treatment.  (Martin Decl. at 1.)

26  Inmate Bohanon, who was in a nearby cell, declares that Plaintiff "practically

27  begged" Esquetini for medical attention and pain medication, and gave him a sick

28  call request.  (Bohanon Decl. at 2.)  Bohanon heard Esquetini say, 'I'll give this to

your PA, and yes I can see the swelling but I'm not your PA." (*Id.*)

### c. __Evidence: Esquetini's Version__

Esquetini declares that as PA he holds "call-out" appointments for SHU inmates in the medical room on Wednesdays, but he only makes a round through the SHU when he is assigned to the "pill line" to pass out medication. (Esquetini Decl. ¶ 3.) According to the SHU sign-in sheets, he was not assigned to the SHU "pill line" on July 19, 2018, or any day that week or the following week, and was only present in the SHU on July 18, 2018, to see patients in the medical room. (*Id.* ¶¶ 3-4, Ex. A.) He has no memory of an encounter with Plaintiff such as Plaintiff describes, and declares that if Plaintiff had shown him his hand and there had been evidence of breakage or swelling, he would have promptly notified Plaintiff's assigned PA, or would have seen Plaintiff himself if she was out, because his practice is to treat a potentially broken bone of an extremity as a medical urgency that warrants an appointment before the following Wednesday. (*Id.* ¶¶ 4-5.) However, a potential broken bone of an extremity is only treated as an emergency if there is an open fracture, because in those cases delay in treatment can lead to blood loss or severe infection. (*Id.* ¶ 5.)

Esquetini declares that he first became aware of Plaintiff's injury on July 23, 2018, when Defendant Alamilla emailed him. (*Id.* ¶ 6.) Alamilla's message said that Plaintiff had injured his hand while exiting the shower and was "requesting to be seen by medical to have his hand checked out and if possible to receive some pain medication due to the swelling." (*Id.*, Exh. B.) Based on that email, Esquetini did not perceive Plaintiff's injury to be an emergency. (*Id.* ¶ 6.) Esquetini did not know that Plaintiff's assigned PA was out that day and he forwarded Alamilla's message to her with a cover message, "Please see him ASAP." (*Id.*, Exh. B.) Esquetini did not learn that Wolverton was on leave until July 25, 2018. Esquetini does not recall any reluctance on his part to see Plaintiff when he was taken to Health Services on July 25, 2018. (*Id.*)

14

1

####     d.    <u>Analysis</u>

2       As previously discussed, Plaintiff has not shown that the one week-delay in

3   medical treatment for his broken finger resulted in any complications or medical

4   harm.  Plaintiff, however, testified that he was in extreme pain during this time.

5   (Templeton Depo. at 61.)

6       Esquetini declares that on July 19, 2018, he was not in the SHU at all; the

7   previous day he was in the SHU only to see inmates in the medical room; and he

8   was not at work on July 20, 21, and 22, 2018.  (Esquetini Decl. ¶ 4.)

9   Nevertheless, for summary judgment purposes the Court will accept as true

10  Plaintiff's deposition testimony regarding an encounter with Esquetini on July 19,

11  2018.  *See Woodson v. Ortiz*, No. 15-cv-1285-WQH-AGS, 2018 WL 500966, at *3

12  (S.D. Cal. Jan. 21, 2018) (accepting as true plaintiff's testimony that defendant

13  waited five days to treat him although defendant claimed that upon learning of

14  plaintiff's broken hand "she promptly scheduled him for the clinic and saw him the

15  very next day—a claim supported by multiple medical records, notes, and other

16  sources"), *accepted by* 2018 WL 1517193 (S.D. Cal. Mar. 28, 2018).  Plaintiff

17  testified that he told Esquetini that he felt his hand was broken and he was in

18  extreme pain.  (Templeton Depo. at 157.)

19      Even under Plaintiff's version, the evidence does not show that Esquetini

20  responded unreasonably.  Plaintiff testified that Esquetini did not examine his

21  hand but only briefly looked at it.  (*Id*. at 157.)  Esquetini was not Plaintiff's

22  assigned PA; he did not know that Plaintiff's assigned PA was on leave; and

23  (according to Plaintiff) he took Plaintiff's sick call slip and said he would deliver it

24  to Plaintiff's PA.  (Esquetini Decl. ¶¶ 2, 6; Templeton Depo. at 42, 157.)  Esquetini

25  was not at work the following three days, July 20, 21 and 22.  (Esquetini Decl.

26  ¶ 4.)  On July 23, 2018, when Esquetini received Alamilla's email regarding

27  Plaintiff's need for medical attention for his hand  – which was not couched in

28  terms indicating an emergency –  he promptly notified Plaintiff's assigned PA, still

1    not knowing she was on leave.  (*Id.* ¶ 6, Exh. B.)

2        Moreover, Esquetini's failure to act other than taking Plaintiff's sick call

3    request and contacting Plaintiff's PA must be viewed in the context of his conduct

4    after he learned of her absence and examined Plaintiff's hand on Wednesday,

5    July 25, 2018.[5]  (Esquetini Decl. ¶ 6.)  After examining Plaintiff's hand, Esquetini

6    was highly responsive to his need for medical treatment.  Esquetini referred

7    Plaintiff for an X-ray and, upon reviewing the results, he immediately made

8    arrangements to have Plaintiff taken to an outside ER, where Plaintiff's hand was

9    placed in a splint the same day.  (*Id.* ¶ 7, Exhs. C, D; Templeton Depo. at 196-

10   98.)  Still on July 25, 2018, Esquetini called an outside orthopedic hand surgeon

11   and scheduled Plaintiff for a consultation on the earliest available day, Monday,

12   July 30, 2018.[6]  (Esquetini Decl. ¶ 7.)  On July 26, 2018, Esquetini prescribed pain

13   medication for Plaintiff.  (*Id.* ¶ 7; Templeton Depo. at 69.)  After the hand surgeon

14   recommended surgery, Esquetini put in a request for surgery, which took place on

15   August 1, 2018.  (Esquetini Decl. ¶ 11; Gilliam Decl., Exh. C.)

16       Viewing the evidence in the light most favorable to Plaintiff, he has not

17   come forth with evidence from which a reasonable jury could infer Esquetini knew

18   that taking Plaintiff's sick call request on July 19, 2018 and contacting Plaintiff's

19   PA on July 23, 2018 constituted insufficient responses to Plaintiff's pain and need

20   for medical treatment.  Although it could be argued that Esquetini should have

21   known that the other PA assigned to SHU inmates was out on leave, that would

22

23       [5]    The factual dispute over whether Esquetini initially did not want to
24   see Plaintiff is immaterial because his alleged reluctance resulted in a trivial
     delay.

25       [6]    Plaintiff testified that he did not see the hand surgeon before the
26   surgery was performed on August 1, 2018.  (Templeton Depo. at 203.)
     Defendants have submitted an Inmate History showing Plaintiff's transfer out of
27   the facility on July 30, 2018 for his medical appointment.  (Esquetini Decl., Exh.
     G.)  The factual dispute over whether Plaintiff saw Dr. Lee prior to surgery on
28   August 1, 2018 is not material to his claims against Esquetini or other
     Defendants.

1   be only negligence that does not rise to an Eighth Amendment violation. *Estelle*,

2   429 U.S. at 105-06.  Given the prompt and appropriate medical treatment

3   Esquetini provided once Plaintiff was brought to the Health Services on July 25,

4   2018, his prior failure to follow up was an "isolated exception" to his "overall

5   treatment" of Plaintiff and does not show deliberate indifference. *Jett*, 439 F.3d at

6   1096 ("If the harm is an "'isolated exception' to the defendant's 'overall treatment

7   of the prisoner [it] ordinarily militates against a finding of deliberate indifference.'"

8   (internal quotation marks and citation omitted)).

9        It is therefore recommended that summary judgment be granted in favor of

10  Defendant Esquetini.

11       **4.**     **Defendant Alamilla**

12       **a.**     **<u>Allegations of Complaint</u>**

13       Plaintiff alleges that he showed Alamilla his hand, described his pain, and

14  requested that he contact medical staff once on July 18, 2018, twice on July 19,

15  2018, and again on July 23, 2018.  (Compl. at 10, 14-16.)  Each time, Alamilla

16  promised to do so but, on the afternoon of July 19, 2018, told Plaintiff that he had

17  not yet contacted medical staff because he had been very busy.  (*Id.* at 15-16.)

18  On July 24, 2018, Alamilla told Plaintiff he had contacted the medical department

19  and "if medical didn't pull [Plaintiff] the following day, that Alamilla would get

20  [Plaintiff] to medical."  (*Id.* at 16.)

21       **b.**     **<u>Evidence: Plaintiff's Version</u>**

22       Plaintiff testified that July 18, 2018, at approximately 3:35 p.m., he showed

23  Alamilla his hand and Alamilla expressed concern, acknowledged that it looked

24  broken, and promised to contact medical staff to place Plaintiff on the list to see

25  the PA.  (Templeton Depo. at 103, 113-16, 120.)  Plaintiff spoke with Alamilla

26  about his hand on July 19, 2018 at 8:14 a.m., and Alamilla made the same

27  promise.  (*Id.* at 109-110.)  Plaintiff spoke with Alamilla again at 2:00 p.m. and

28  Alamilla said he hadn't done it yet because he had been very busy.  (*Id.* at 110.)

1    Plaintiff spoke with Alamilla about his hand again on July 23, 2018, at 10:00 a.m.,

2    and Alamilla told him that he was going to contact the medical staff and place

3    Plaintiff on the list to be seen for the following Wednesday, July 25, 2018.  (*Id.* at

4    111-14, 121, 123-24, 177.)  Plaintiff was not happy to have to wait two more days

5    but he thought it best to simply say, "Thank you."  (*Id.* at 123.)  Plaintiff was taken

6    to Health Services on July 25, 2018.  (*Id.* at 193.)  He was not "on the list" but was

7    taken there after the correctional officers talked to Alamilla.  (*Id.* at 55-56.)

8        Plaintiff's cellmate Martin declares that Plaintiff showed Alamilla his hand

9    and requested medical attention on July 18, 2018, and also complained about it to

10   Alamilla on July 19, 2018.  (Martin Decl. at 1.)  Inmate Bohanon saw and heard

11   Plaintiff talk to Alamilla about his hand injury and need for medical attention and

12   pain medication on July 19, 2018.  (Bohanon Decl. at 1.)

13                    **c.    Evidence: Alamilla's Version**

14       Alamilla declares that from June 2017 until November 2018, he was SHU

15   Lieutenant at FCC Victorville.  (Declaration of J. Alamilla dated December 3, 2021

16   ("Alamilla Decl.") ¶ 2.)  If a SHU inmate orally complained to him about medical

17   issues, his general practice was to notify the inmate's assigned PA.  (*Id*. ¶ 5.)

18       According to the SHU sign-in sheets, Alamilla did not work on the morning

19   of July 19, 2018, and he has no recollection of speaking with Plaintiff on the

20   afternoons of July 18 and 19, 2018.  (Alamilla Decl. ¶ 6-7, Exh. B.)  He is "nearly

21   certain" that Plaintiff did not complain to him about his pinky finger on those dates

22   because he specifically recalls that when Plaintiff complained about his pinky

23   finger injury on July 23, 2018, Alamilla emailed Esquetini the same day.  (*Id*. ¶ 8,

24   Exh. C.)  Alamilla recalls Plaintiff complaining abut his pinky finger on July 23,

25   2018, but he is certain that Plaintiff did not show his hand to him on that date.  (*Id*.

26   ¶ 10.)  He recalls walking Plaintiff "to medical" on July 25, 2018, when Plaintiff first

27   showed him his pinky finger, and his review of records shows that this occurred

28   on July 25, 2018.  (*Id*. ¶ 11.)

1      Alamilla declares that if Plaintiff had shown him his hand on July 23, 2018,

2   and it had been in the condition described in the complaint, he would have

3   immediately walked Plaintiff down to Health Services or at least would have

4   emphasized the urgency of the situation in his email to Esquetini.  (*Id*. ¶¶ 10-11.)

5                    d.    <u>Analysis</u>

6      There is a dispute of fact regarding when Plaintiff first notified Alamilla of his

7   hand injury and when Plaintiff first showed him his hand.  Nevertheless, accepting

8   as true that Plaintiff showed Alamilla his hand on July 18, 2018, and spoke to him

9   about it again on July 19, 2018, Plaintiff has not shown Alamilla was deliberately

10  indifferent.  Alamilla has no medical training (Alamilla Decl. ¶ 3) and the email he

11  sent to Esquetini on July 23, 2018, shows that he did not view Plaintiff's hand

12  injury as an emergency.[7]  (*Id.*, Exh. C.)  It is uncontroverted that Alamilla was not

13  assigned to the SHU on July 20, 21, and 22, 2018.  (*Id*. ¶ 9.)  When Plaintiff

14  brought up the matter again on July 23, 2018, Alamilla promptly contacted

15  Esquetini to notify him of Plaintiff's need for medical care.  (*Id*. ¶ 10, Exh. C.)  The

16  parties agree that Plaintiff was taken to the Health Services on July 25, 2018, as a

17  result of Alamilla's intervention, though they disagree regarding whether Alamilla

18  personally took him there (as Alamilla declares) or whether other officers did so

19  based on Alamilla's instructions.  (*Id*. ¶ 11; Templeton Depo. at 55-56.)

20     At most, Alamilla was negligent in failing to procure medical care for Plaintiff

21  promptly after their July 18 and 19 encounters.  But delays in medical treatment do

22  not violate the Eighth Amendment unless the defendant knows that "delays would

23  cause significant harm" and consciously disregards the risk.  *Hallett*, 296 F.3d at

24  746; *see Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004) ("there must be a

25  *conscious* disregard of a serious risk of harm for deliberate indifference to exist"

26  _____

27          [7]     That email stated: "Inmate Templeton, Reg. No. 15422-031, injured
    his left hand while exiting the shower within his cell.  Inmate Templeton is
28  requesting to be seen by medical to have his hand checked out and if possible to
    receive some pain medication due to the swelling."  (Alamilla Decl., Exh. C.)

1   (emphasis in original)).  Viewed in the light most favorable to Plaintiff, the evidence

2   would not enable a rational jury to find that Alamilla knew Plaintiff needed

3   immediate medical attention and purposefully failed to respond to Plaintiff's pain

4   and medical need.  *Compare Lolli v. County of Orange*, 351 F.3d 410, 421 (9th Cir.

5   2003) ("officers' indifference to Lolli's extreme behavior, his obviously sickly

6   appearance and his explicit statements that he needed food because he was a

7   diabetic could easily lead a jury to find that the officers consciously disregarded a

8   serious risk to Lolli's health"); *Barbee v. Jefferson County*, No. C05-5005-RBL,

9   2006 WL 278561, at *3-4, 6 (W.D. Wash. Feb. 3, 2006) (denying summary

10  judgment for defendant who could have inferred from plaintiff's numerous requests

11  to be taken to hospital and appearance of his severely infected hand that plaintiff

12  needed immediate medical attention; infection eventually necessitated amputation

13  of finger and physician declared that earlier medical attention would have

14  dramatically increased chance of saving finger).

15          It is therefore recommended that summary judgment be granted in favor of

16  Defendant Alamilla.

17                  **5.      Defendant Rivera**

18                        a.      <u>Allegations of Complaint</u>

19          Plaintiff alleges that: on July 19 and 20, 2018, he showed Rivera his injured

20  hand and requested medical attention and pain medication, but Rivera said he

21  could not give Plaintiff any pain medication until it was prescribed by a PA; on July

22  21, 2018, Rivera examined Plaintiff's hand and promised to contact a PA; and on

23  July 23, 2018, Rivera took a sick call request from Plaintiff.  (Compl. at 21-22.)  On

24  July 26, 2018, Rivera brought Plaintiff a bottle of 800 mg ibuprofen.  (*Id.*)

25                        **b.      <u>Evidence: Plaintiff's Version</u>**

26          Plaintiff testified that on July 19, 2018, he asked Rivera for pain medication

27  and Rivera told him to fill out a sick call request.  (Templeton Depo. at 165.)

28  Plaintiff showed Rivera his hand briefly through the window.  (*Id.* at 166.)  He told

20

Rivera that he felt his hand was broken and "hurt to all hell." (*Id.* at 166-67.) He filled out a sick call request but did not give it to Rivera during this encounter. (*Id.* at 165-66.)

On July 20, 2018, Plaintiff showed Rivera his hand again, just for a few seconds, and asked for pain medication and to be taken to Health Services. (*Id.* at 168.) On July 21, 2018, Rivera examined Plaintiff's hand through the trap door. (*Id.* at 170-71.) He agreed that it seemed broken and that there was discoloration, and said that "he would see" what he could do about having Plaintiff seen by Health Services. (*Id.* at 171, 173.) On July 23, 2018, Rivera just walked by and Plaintiff handed him a sick call request regarding his hand. (*Id.* at 176-77.)

### c.    Evidence: Rivera's Version

Rivera declares that until December 2018, he was a medication technician at FCC Victorville. (Declaration of C. Rivera dated December 5, 2021 ("Rivera Decl.") ¶ 2.) His duties included passing out medication (the "pill line") but he was not authorized to provide medical care. (*Id.*) When SHU inmates raised non-urgent medical complaints with him, he would give them sick call forms, collect the forms, and place them in the box of the inmate's assigned PA. (*Id.* ¶ 3.) If the issue seemed urgent, or if the inmate complained about a delay in being seen, he would speak with the inmate's PA. If the issue seemed to be an emergency, he would walk the inmate to Health Services. (*Id.*)

Rivera declares that he does not recall Plaintiff complaining about his hand on July 19 or 20, 2018 and, according to SHU sign-in sheets, Rivera was not in the SHU on July 21, 2018. (*Id.* ¶¶ 5-6.) If Plaintiff did complain about his hand on July 19 or 20, 2018, Rivera is "near certain" that Plaintiff did not show him his hand or explain his injury in a way that would have enabled Rivera to appreciate its significance. (*Id.* ¶ 6.)

Plaintiff showed Rivera his hand on July 23, 2018. Rivera immediately emailed PA Wolverton: "At your discretion would you please take a look at

21

1
2
3
4
5

[Plaintiff].  The inmate has an injury to his right hand, it is swollen, and tender to palpation.  It looks like it could be a boxer's fracture."[8]  (*Id.* ¶ 7, Exh. A.)  Rivera did not consider Plaintiff's hand to be a medical emergency because he did not see evidence of open fracture, discoloration or bleeding, and Plaintiff indicated a moderate but not severe level of pain when Rivera touched it.  (*Id.*  ¶ 10.)

6
7
8
9

However, Rivera recalls that Plaintiff complained about his pinky finger on more than one occasion and gave Rivera more than one sick call form concerning the finger, each of which Rivera placed in Plaintiff's PA's box.  (*Id.* ¶ 9.)  Rivera was not working in the SHU on July 24 or 25, 2018.  (*Id.* ¶ 11.)

10

### d.   **Analysis**

11
12
13
14
15
16
17
18

The uncontroverted evidence shows that Rivera turned in Plaintiff's sick call requests, examined Plaintiff's hand (though the parties differ regarding the date), and emailed Plaintiff's assigned PA asking her to look at Plaintiff's hand because Plaintiff had what looked like a boxer's fracture.  (Templeton Depo. at 171-72; Rivera Decl. ¶ 7, Exh. A.)  Rivera declares that based on his examination, he did not believe Plaintiff's injury to present the type of emergency that would warrant immediately taking Plaintiff to Health Services but he promptly emailed Plaintiff's PA.  (*Id.* ¶ 10.)

19
20
21
22
23
24
25

Rivera followed prison procedures in his handling of Plaintiff's requests for medical care.  The evidence does not raise an inference that he acted in the conscious knowledge that turning in Plaintiff's sick call requests and emailing Plaintiff's PA constituted an insufficient response to Plaintiff's pain and medical need.  There is no evidence Rivera knew that Plaintiff's PA was on leave that week, and Rivera himself was not authorized to provide medical care.  (*Id.* ¶ 2.)  *See Demerson v. Woodford*, No. 1:08-cv-00144-LJO-SKO PC, 2013 WL 3773845, *4

26
27
28

[8]    Rivera declares that a "boxer's fracture" is a break of the pinky knuckle," and in the SHU boxer's fractures are commonly the results of inmate fights.  (Rivera Decl. ¶ 8.)

1
2
3
4
5
6
7
8
9
10
11
12

(E.D. Cal. July 17, 2013) (granting summary judgment for defendants who notified medical department of plaintiff's complaints of chest pain when plaintiff suffered no medical harm from episode); *Blue v. Davis,* No. C05-0315-TSZ-JPD, 2006 WL 1519287, at *5 (W.D. Wash. May 25, 2006) (granting summary judgment for officers who notified medical personnel of plaintiff's condition in accordance with prison procedures); *see generally Toguchi*, 391 F.3d at 1060 (stressing necessity for showing of conscious disregard of serious risk to health).  As previously discussed, Plaintiff was seen at the Health Services and an outside ER two days after Rivera's July 23, 2018 email.  There is no evidence that the outcome of his August 1, 2018 surgery was adversely impacted by any delay.  Rivera was not at work during the two days between his July 23, 2018 email to PA Wolverton and Plaintiff's medical treatment on July 25, 2018.  (Rivera Decl. ¶ 4.)

13
14

It is therefore recommended that summary judgment be granted in favor of Defendant Rivera.

15

**6.    Defendant Blier**

16

**a.    Allegations of Complaint**

17
18
19
20
21
22
23
24

On July 18, 2018, at about 5:36 p.m., Plaintiff stopped Blier during his rounds, showed him his hand and said he was experiencing level 10 pain.  (Compl. at 17.)  Blier said Plaintiff would need to fill out a sick call request.  Plaintiff handed Blier a form he had already filled out and Blier said he would give it to the PA.  (*Id.*)  On July 19, 2018, at about 9:11 a.m., Plaintiff again stopped Blier and told him the pain was unbearable.  Blier acknowledged there was something wrong with Plaintiff's hand but joked that Plaintiff's hand would "never be as bad" as Plaintiff's face.  He laughed and left.  (*Id.*)

25
26
27
28

On July 23, 2018, at about 4:49 p.m., Plaintiff told Blier that his hand had been broken for five days and he was in great pain.  He begged Blier to arrange for him to see the PA.  (*Id.* at 17-18.)  Blier said he would talk to the PA about it.  (*Id.* at 18.)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### b.   Evidence: Plaintiff's Version

Plaintiff testified that on July 18, 2018, he briefly showed Blier his hand, told him about his injury and pain, and gave him a sick call request.  (Templeton Depo. at 134-35, 140.)  He did not recall whether he told Blier that his hand was broken.  (*Id.* at 140.)  He testified that he spoke to Blier again on July 23, 2018, said his hand was broken and "hurting like hell," and asked Blier to arrange for Plaintiff to see the PA.  (*Id.* at 182-83.)  Blier said he would talk to the PA.  (*Id.*)

Inmate Bohanon declares that on July 18, 2018, he heard Plaintiff tell Blier about his broken hand and need for medical attention.  (Bohanon Decl. at 1.)  Plaintiff gave Blier a sick call request.  (*Id.*)

### c.   Evidence: Blier's Version

Blier declares that at relevant times he worked at FCC Victorville as a clinical nursing supervisor.  (Declaration of N. Blier dated December 3, 2021 ("Blier Decl.") ¶ 2.)  With respect to the SHU, he was occasionally assigned to the "pill line" to pass out medications, or he conducted rounds to pass out and collect sick call forms as a member of the Executive Staff, or he made rounds of the SHU when acting as Duty Officer.  (*Id.*)  In the absence of a medical emergency, he was not authorized to and did not provide medical treatment to SHU inmates inside their cells.  (*Id.* ¶ 3.)  He also would not examine an inmate in his cell because he considered it a violation of medical privacy and, further, the SHU lighting is bad.  If the matter was non-urgent, Blier would give the inmate a sick call form; if the matter was urgent (but not emergent), he would in addition verbally advise Health Services that the inmate needed to be seen right away.  (*Id.* ¶¶ 3-4.)

Blier does not remember Plaintiff or any complaints he made about his hand.  (*Id.* ¶ 6.)  Blier was Duty Officer on July 18, 19, and 23, 2018, and as such may have passed through the SHU, although he does not always make SHU rounds when acting as Duty Officer.  However, he would not have closely examined Plaintiff's hand while Plaintiff was in his cell.  (*Id.* ¶¶ 7-8, 10.)  Because inmates

24

often exaggerate their pain, even if Plaintiff described his pain as level 10, Blier would not necessarily treat the case as an emergency unless Plaintiff's behavior and appearance corroborated extreme pain.  (*Id.* ¶ 8.)  If Plaintiff gave Blier a sick call form, Blier would have given it to Plaintiff's PA or placed it in her box.  (*Id.*)  Blier denies that he ever made a joke about an inmate's pain such as Plaintiff alleges in the complaint.  (*Id.* ¶ 9.)

### d.  **Analysis**

There is no evidence in the record that Blier made the joke that Plaintiff attributes to him in the complaint.  The complaint is not verified and its allegations do not constitute evidence.  Plaintiff has not filed an opposition or otherwise submitted any evidence, and there is no testimony about the alleged joke in the portions of the deposition transcript submitted by Defendants or in the inmate declarations attached to the complaint.  Thus, Blier's emphatic denial that he made the joke is uncontroverted.  (Blier Decl. ¶ 9.)  In any event, rude comments by a medical professional do not in and of themselves violate the Eighth Amendment.  *See, e.g*, *Woodson*,  2018 WL 500966, at *4 ("the Constitution does not compel prison medical staff to be informative or polite; they must simply provide the minimum care required by the Eighth and Fourteenth Amendments"); *Alcon v. Bright*, No. C14-01927 SI, 2016 WL 795489, at *9 (N.D. Cal. Mar. 1, 2016) ("rudeness is not the same thing as deliberate indifference").

Accepting as true Plaintiff's deposition testimony about his encounters with Blier on July 18 and 23, 2018, Plaintiff has no evidence that Blier did not turn in the sick call request that Plaintiff handed him on July 18, 2018, other than the fact that the sick call request had no effect.[9]  Defendants argue that Plaintiff similarly has no

---

[9]     Blier could not have turned in the sick call request to PA Wolverton personally because she was away from work that week.  (Templeton Depo. at 72, 158, 160; Esquetini Decl. ¶ 6.)  But Wolverton's absence also means that her failure to respond to Plaintiff's sick call request does not support an inference that Blier never placed the sick call request in her box.

evidence that Blier did not contact Plaintiff's PA as he promised (according to Plaintiff) on July 23, 2018.  However, unlike Alamilla (who provided evidence that he emailed PA Esquetini) and Rivera (who provided evidence that he emailed PA Wolverton), Blier has not provided evidence that he contacted either PA about Plaintiff.

Even so, there is no evidence that Blier said or did anything indicating awareness that Plaintiff needed prompt pain relief and/or medical attention, nor did Plaintiff testify to anything supporting an inference that his pain and medical attention must have been obvious to Blier.  *See Farmer*, 511 U.S. at 842 ("factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious").  Blier denies that he was aware that Plaintiff had a broken hand or was in severe pain, and declares that if he had perceived or understood that Plaintiff's hand was broken or that Plaintiff was in severe pain or had significant swelling, he would have requested that Plaintiff be seen that day. (Blier Decl. ¶ 11.)  Plaintiff testified that he told Blier about his pain, but Blier declares that he would not necessarily credit an inmate's description of his pain as level 10 unless the inmate's behavior was consistent with being in extreme pain. (Templeton Depo. at 134, 182; Blier Decl. ¶ 8.)

As previously discussed, Plaintiff received medical treatment two days after his last encounter with Blier and pain medication a day later, and he did not sustain any medical harm as a result of any delay by Blier.  Although the issue is closer than with respect to the other Defendants, Plaintiff has not shown a triable dispute of fact regarding Blier's deliberate indifference.

It is therefore recommended that summary judgment be granted in favor of Defendant Blier.

### 7.    Defendant Leen

#### a.    Allegations of Complaint

Plaintiff alleges that on July 24, 2018, at about 9:51 a.m., he stopped Leen at

his cell door, showed her his injured hand, and told her that it had been broken for six days and medical staff were ignoring his requests for pain medication and medical attention.  Leen wrote down the information and left.  (Compl. at 27.)

After Plaintiff was taken to the Health Services on July 25, 2018, Esquetini initially said he was not on the sick call list, but he treated Plaintiff after Leen verified that Plaintiff had reported his injury to her.  (*Id.* at 21.)

### b.  Evidence: Plaintiff's Version

Plaintiff testified that on July 24, 2018, he told Leen his hand was broken and he had turned in sick call requests and spoken to numerous people, but had not received medical attention or pain medication.  (Templeton Depo. at 183-84, 186-87.)  He showed her his hand, which was swollen, but she did not examine it.  Plaintiff did not expect her to do so because that's not what a health services administrator does.  (*Id.* at 187.)  Plaintiff's impression was that Leen was shocked by the appearance of his hand, but she merely wrote down his information on her notepad.  (*Id.* at 187-88.)

On July 24, 2018, when Plaintiff was at Health Services and Esquetini was said he was not on the list to be seen, Leen came up and said that "she knew about it."  (*Id.* at 185-86.)  Esquetini then sent Plaintiff to be x-rayed.  (*Id.* at 186.)

### c.  Evidence: Leen's Version

Between April 2016 and August 2018, Leen was Assistant Health Services Administrator at FCC Victorville.  (Declaration of R. Leen dated December 5, 2021 ("Leen Decl.") ¶ 2.)  Her duties included doing weekly SHU rounds to become aware of medical complaints from inmates and assigning those medical issues to Health Services staff for follow-up.  When she received a non-urgent non-emergent complaint from an inmate, her practice was to make a note and contact medical staff after completing her round.  (*Id.*)

Leen recalls that she saw Plaintiff in his cell on July 24, 2018, and he held up his hand at the cell door.  (*Id.* ¶ 5.)  Leen did not see evidence of an open fracture,

which she would have treated as an emergency.  She also did not see any evidence of an obvious fracture.  Plaintiff did not sound as if he was in significant pain.  She specifically recalls reporting Plaintiff's complaint to Esquetini the same day, July 24, 2018.  (*Id.*)  She declares that Plaintiff's description of the severity of his injury is not consistent with her recollection of the encounter.  (*Id.* ¶ 6.)

### d.   Analysis

It is undisputed that on the day after his encounter with Leen, Plaintiff was taken the Health Services, x-rayed, sent to the ER where his hand was placed in a splint, and scheduled for a consultation with a hand surgeon.  The following day, Plaintiff was prescribed pain medication.  (Esquetini Decl. ¶¶ 7, 10, Exhs. D, E; Templeton Depo. at 193-95.)  Thus, even if Leen had failed to respond to Plaintiff's medical need, she could not be responsible for more than one day of the delay in treating Plaintiff.

Furthermore, Leen responded reasonably to Plaintiff's medical needs as she perceived them (Leen Decl. ¶ 5.)  Leen declares that that she did not see an obvious fracture and her observations of Plaintiff's demeanor and tone of voice did not indicate to her that he was in significant pain.  (*Id.* ¶¶ 4, 6.)  She reported Plaintiff's complaint to Esquetini the same day and, although Esquetini does not mention Leen in his declaration, there is no evidence controverting that she did so.  Even under Plaintiff's version of the events, Leen was instrumental in having him seen and treated by Esquetini.  (Templeton Depo. at 185-86.)  Nothing about Leen's conduct suggests deliberate indifference to Plainitff's serious medical needs.

It is therefore recommended that summary judgment be granted for Defendant Leen.

### 8.   Defendant Reams

#### a.   Allegations of Complaint

On July 18, 2018, at about 6:02 p.m., Plaintiff stopped Lieutenant Reams

during his routine walk-through.  Plaintiff showed him his swollen and bleeding
hand and told him he was in severe pain and needed medical attention.  (Compl. at
28)  Reams told him there was nothing he could do and "it was left to medical."  (*Id.*
at 28-29.)

### b.     Evidence: Plaintiff's Version

Plaintiff testified to his encounter with Lieutenant Reams at his deposition.
(Templeton Depo. at 145-46.)  At the time he did not know Reams' name but he
later asked another inmate.  (*Id.* at 146-47.)  He showed Reams his hand for "5 to
10 seconds" and told him he thought it was broken, he had shown it to Lieutenant
Alamilla earlier, and he needed pain medication.  (*Id.* at 148-50.)  Reams said,
"Well, there's nothing I can do.  That stuff is up to medical."  (*Id.* at 148, 150.)

### c.     Evidence: Reams' Version

Reams has been a lieutenant at FCC Victorville since 2016.  (Declaration of
S. Reams dated December 2, 2021 ("Reams Decl.") ¶ 1.)  In the summer of 2018,
he was serving as Operations Lieutenant.  (*Id.* ¶ 4.)  As Operations Lieutenant, he
generally makes a single 15 to 20 minute daily round through the SHU, but only if
there is no SHU Lieutenant assigned to the same shift or if there is some special
reason for Reams to be present.  (*Id.* ¶ 5.)  When responding to medical
complaints, Reams' response depends on the severity of the issue.  In case of
emergency, he takes the inmate to Health Services or brings a medical
professional to the inmate's cell; in urgent cases, he calls the PA; for non-urgent
and non-emergent complaints, he makes a note in his notebook and calls or emails
the PA at the end of his round.  (*Id.* ¶ 6.)

Reams does not recall Plaintiff and does not recall any inmate complaining
about an injured finger.  (*Id.* ¶ 8.)  If Plaintiff had shown him a swollen bleeding
hand and told him that his finger was broken, the bone was coming through and he
was experiencing level 10 pain, he would remember the encounter and would have
taken Plaintiff to Health Services or brought medical personnel to his cell.  (*Id.* ¶ 9.)

29

In addition, if Plaintiff had shown him his injured hand and it did not appear to be an emergency, Reams would have suspected Plaintiff of having sustained his injury in a fight and would remember the incident for that reason.  (*Id.*)

When an inmate reports a non-emergent medical issue to him, his practice is to ask the inmate if he has informed medical staff.  (*Id.* ¶ 11.)  If the response is affirmative, he considers the issue resolved.  If Plaintiff had told Reams that he had already handed Blier a sick call request, there would have been nothing further for Reams to do.  He would have told Plaintiff that his PA would see him either the following Wednesday or sooner.  (*Id.*)

### d.   <u>Analysis</u>

Plaintiff alleges a single encounter with Reams on July 18, 2018, a few hours after he sustained his injury.  Reams does not recall Plaintiff or their encounter and, based on his usual practice in handling medical complaints during his SHU rounds, he doubts that it happened.  Accepting Plaintiff's testimony regarding an encounter with Reams as true for purposes of this motion, Plaintiff's evidence is insufficient to show deliberate indifference.

Reams has no medical training and according to Plainitff he looked at Plaintiff's hand only briefly.  (Reams Decl. ¶ 3; Templeton Depo. at 146.)  There is no evidence that he said or did anything indicating awareness that Plaintiff needed immediate medical attention.  Plaintiff testified that he told Reams that he had already spoken with Alamilla, the SHU Lieutenant.  (Templeton Depo. at 149-50.)  According to Plaintiff's testimony, he had also already given a sick call request to Blier, though Plaintiff did not recall telling Reams so.  (*Id.* at 155.)

Furthermore, Plaintiff must show a causal connection between Reams' failure to act and Plaintiff's injuries.  *See Lemire v. Cal. Dep't of Corr. and Rehab.*, 726 F.3d 1062, 1074 (9th Cir. 2013) ("plaintiffs alleging deliberate indifference must also demonstrate that the defendants' actions were both an actual and proximate cause of their injuries").  "The inquiry into causation must be individualized and

focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation." *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988).  Reams was not a medical professional and all he could do for Plaintiff was contact medical staff or take him to Health Services. Since no evidence shows that Plaintiff required immediate medical attention that evening, Reams would at most have taken another sick call slip from Plaintiff or contacted one of the two PA's assigned to SHU inmates, Wolverton or Esquetini. (Reams Decl. ¶ 11.)  Plaintiff testified that he had already given a sick call slip to Blier, Wolverton was out on leave, and according to Plaintiff's testimony – though Esquetini denies it  – Plaintiff spoke with Esquetini regarding his hand and gave him another sick call request the morning after his encounter with Reams. (Templeton Depo. at 72, 135, 158.)

Thus, even assuming Plaintiff requested medical care from Reams on July 18, 2018, as Plaintiff at tested at his deposition, Plaintiff has not shown that any part of the one-week delay in receiving medical care and pain medication is attributable to Reams.

It is therefore recommended that summary judgment be granted for Defendant Reams.

### 9.   **Qualified Immunity**

Defendants contend that they are entitled to qualified immunity.  Because the court has concluded that Plaintiff has not shown a triable dispute of fact as to his Eighth Amendment claim against Defendants, it is unnecessary to address their qualified immunity arguments.

**VI.**

**RECOMMENDATION**

For the reasons discussed above, it is recommended that the District Court issue an order (1) accepting this Report and Recommendation; (2) granting Defendants' motion for summary judgment; and (3) directing that judgment be

entered dismissing this action with prejudice.

DATED: September 2, 2022

_____
ALICIA G. ROSENBERG
United States Magistrate Judge